on January 3rd, 2023, there was a search warrant executed his apartment. They found two what they call Glock switches, which literally looking at my fingertips is one and a half by one inch goes under the slide of a pistol and will allow a clock pistol when with one finger pull to fire a shot at a target. They also found two auto sears, which are similar devices designed for AR rifles that will allow them to fire more bullets with one finger pull. This fit the definition of a machine gun of the National Firearms Act, which requires such devices to be registered and to pay a fee. My client had not done that, and the National Firearms Act further prohibits the possession of such devices if you haven't registered them. Simmons was charged with one count of doing this a few months later, and that's what he pled guilty to. And under 2K2.1, there's a provision he would have started at a base offense level 18 for committing that offense. And during the PSR process, a question came up whether it was appropriate to increase his guidelines referring to 922G for being a prohibited person. And that's because when he executed the search warrant, he had 11 grams of marijuana, and during his statement to authorities incident to that January 2023 arrest, he admitted over the previous three months after catching his wife in an affair, he had resumed using Adderall, and when he couldn't get it, he had used methamphetamine. There was nothing in the record that he was intoxicated at the time he possessed both NFA and non-NFA guns in his apartment. He did not admit to a level of use or type or use of drugs that indicated that he was either fully addicted or so impaired that he posed a consistent danger with it. And again, at the time of his arrest, he was sober. He was on his way leaving the apartment when he executed the warrant in the predawn hours that day. So I objected to that. The government had asked for it. The probation office included it. The ultimate result was an offense level that was substantially higher because he was considered a prohibited person. The non-NFA, the non-NFA violative weapons were included in the number of guns attributed to the incident. Is that in B1? Yes. No, no, no. I'm sorry. Yes, that's B1. That's the B1 A and C, excuse me, B and C. The A kicked it from an 18. I wanted to ask about B1, which is one of the, I think related to what you're saying, is that all the guns, whether they're NFA, were considered in totaling up those number of guns. Correct. I'm trying to make sure I'm understanding B1 right. It says the offense involved three or more firearms. And the offense in B1, isn't it referring to the offense of conviction? You know, that's a good question, Your Honor. I've always kind of done it broadly where the guidelines of final offense is including the relevant conduct. Certainly, I mean, to me, relevant conduct is part of sentencing at times, but just reading the offense, it seems to me that would apply to the offense at issue here, which is That's certainly how I've been arguing it. Yes. And the offense only involved at most three guns or weapons, right? There were, I think, between eight and 24 NFA weapons, which would, in my mind, there were silencers and other things besides the auto sears and the Glock switch. But if it was less than 25 NFA arguments, NFA weapons, and the offense applies to failure to register NFA weapons, it would be an incorrect application of the guidelines without even thinking about Bruin or Second Amendment. Right, but that, well, correct. Because your argument is that if you consider constitutionally protected weapons, it violates Bruin, but if B1 only applies to the NFA weapons, you're not challenging that NFA weapons and the restrictions on that violate Bruin. That's correct. We chose not to in that case. I've got another one coming up where I have, but I made the decision in that case to leave it alone. And that's how we thought we were doing going into the sentencing until the prohibited person came up. So if what we just talked about is right, at least for the .6, you add six points, we address that without doing a Bruin analysis at step one or step two? It could be four instead of six, and that would have been incorrectly calculated, you're right. And the district court should go back and apply B1 correctly? At a minimum there, yes. But A comes into this as well because we get the two additional offense levels out of that. Do you mind if I ask you about that? Not at all. While we're there, you seem to argue that, as I understand the A4 analysis, you're not challenging anything about the part of A4 that involves the NFA violation? Correct. And your reference, your complaint about A4 is the incorporation to the extent it's incorporated of 922G3? Correct. Is it fair to say, I mean, the statute says is a prohibited person at the time of the offense, and then the commentary says prohibited person includes someone who's described in 922G3? Correct. So why isn't that just saying we bring from 922G3 the definition or description of users and incorporate that definition, but we're not really doing a 922G3 conviction? Well, it's not a conviction, you're right, but you're still looking at the elements of the offense. I mean, we have that from REHAFE. This is not a regulatory statute with a minimum penalty. This is something that if it was under G3, now with the bipartisan reform act, would be 15 years in prison as a maximum. But if we had, if there was a statute that said you can't, this is maybe silly, but you can't own a souped up Corvette if you're a prohibited person under 922G3. Well, you don't have a constitutional right to have a souped up Corvette, you do have a constitutional right to have a gun, and that's the problem. But you don't have a constitutional right to have an NFA, the second amendment doesn't protect the NFA weapons, does it? Right now for a different reason. We saw that in Bianchi and we saw it in Price. But that's my point, if the weapon based on Bianchi is not protected, and why does utilization of 922G3's prohibited person implicate brewing? You're not going to punish somebody for their race. You're not going to punish somebody for their religion. You're not going to punish someone for the other first amendment protected conduct, their political orientation, or who they associate with necessarily. You might with felons, but that's different. That would be an exception. This is second amendment protected conduct right now, applying Bruin, applying even Rahimi, and that is being used to increase the penalty here. How is it second amendment, I'm sorry to interrupt you, I'm really interested in your response, but how is it second amendment conduct if the weapon is based on our recent precedent, not protected conduct, and the reference to 922G3 is not a 922G3 conviction, but the definition of a user? That's getting into two, this was before the variant stage, the 3553A phase, and that's very broad, right? You can look at the history and characteristics of the offender and fashioning an appropriate sentence, which as Beckles said, within the statutory range. What the guidelines are doing is grabbing out 2G, the gun control act, and saying, hey, we're going to enhance punishment based on your status. Rehab says that's so important, we even have to have a knowing element added to it. So just saying it glosses the definition, that's okay, you're still getting an unconstitutional definition of conduct. But why wouldn't that apply to my Corvette example then? Because again, you don't have a constitutional right to have the Corvette. Because you don't have a constitutional right to have an NFA weapon. Right, but I have a non-NFA weapon. You're right with the NFA. But there's no enhancement based on your non-NFA weapon in A4. That goes back to the status that it was worse. The status? I'm sorry, don't confuse what I'm saying. I'm not saying that it's okay, you can't be a drug user and we can enhance the NFA punishment. I'm not saying that. I'm saying the status of being a G3 defined to the extent it clearly defines anything, still violates Bruin and you can't use that to enhance his punishment here in determining his guidelines. So even if you lifted it on the Corvette, say we had a constitutional right to have a Corvette, that would still be inappropriate. The NFA was fine because I didn't object to it. In later thinking and analysis, I don't think it applies, but I didn't argue it in this case. But there are two components of it. There's a type of weapon and there's the status. And we have had since Heller, we saw this with the core non-core before Bruin, all these reasons to come up with a diminished Second Amendment status to maintain the status quo that was not in the text of the Second Amendment and really wasn't in Bruin. And the United States has argued in countless cases, and I hope even if I lose this appeal, you put this to bed just like Rahimi did with Responsible. That Bruin did not, excuse me, Heller did not ruin. The Supreme Court has not ruled. That Second Amendment only applies to perfect people and law-abiding citizens. If you turn around and say, well, the way this is structured, you don't win. Please make that finding. Please clear that point. So in future cases, we are focusing on the historical application if it's applicable, if we're really doing a Bruin challenge. Instead of this, most of the briefing in this case is, my client's not entitled to Second Amendment protection. That's not what Heller says. Heller says you're part of the people even if you have polka dots, COVID, and you can't say anything but cuss words. And then you get down, you know, we've got another overlay of the type of gun. We have all these layers to keep from shifting the burden to the government, which was the whole point of Bruin, the deference to a fundamental right. And as you said in one of the previous arguments about 20 years' imprisonment, it's supposed to be harder to regulate this conduct. It's not a prohibition on it, but it's a burden to carry, Judge Gregory. And all of this totaled up on the front end of Bruin step one is doing what? It's doing what we were doing with means and scrutiny. It's putting all the burden back on the defendant, on the citizen being regulated, on the citizen being denied the right. I mean, this is weird how this came up in a sentencing context. It was an opportunity. We've got Alston coming up, and I'm sorry I missed it before, that has this directly in a case where in North Carolina they said 922G3 is applied to him, is unconstitutional. This is in a sentencing context. But without 922G3 being unconstitutional, other than the B-1 relief we would get, the main relief would be with A. Because in addition to the type gun, the status, if it's unconstitutional, I would have had a 30 to 37-month guideline range to work with. And instead I started off with 57 to 71 months. He came down two years. And I have a question. Yes, ma'am. Sorry, Judge Berner. Can we get to your rule in step two challenge? I understand you're making an as-applied challenge. Yes. 922G3, is that right? Yes. You're not making a physical challenge. Yes. So your client admitted to using methamphetamine, is that right? Right. And I understand there's also evidence of prior violent domestic violence. Is that right? That was disputed, and Judge Chambers did not consider that at sentencing. That was in the PSR. But we contested that, and that wasn't addressed at his sentencing. So just focusing on the methamphetamine use, is it your argument, then, that a finding that an individual who admitted to using methamphetamine is not then properly does not come properly under 922G3? Yes. Yes, without more. And that's what I addressed on the historical side. Conley picked up on this in the Fifth Circuit. Right, but Conley was a non-violent marijuana smoker. He was not somebody who was admitted to using methamphetamine. Or Adderall to stabilize himself during the day. I've had countless clients with ADHD who are a Tasmanian devil until they get the stimulant to settle down. And they use methamphetamine prophylactically like that, not to go on the binges or to pull. There's no evidence in the record of his behavior of either consuming an amount of methamphetamine for a period of time, purity, or engaging in regular behavior that would have justified his disarmament just because in a period of emotional stress, he used it to replace Adderall when he couldn't get a prescription. So just saying we've got one drug. So in looking at the historical analogs that the government has pointed out, they suggested that under those historical analogs, there would have to have been evidence of dangerous behavior or evidence of individuals acting in a manner that is dangerous? I briefed way away from the word dangerousness because it is so open-ended. Certainly, you would need more of that and evidence of that. But those analogs, they address acute events, whether you're going to have the mentally ill were treated, they were disarmed during the period of lunacy, which was considered temporary. They didn't forfeit their rights. They may have been locked up and some of their property sold to pay for their period of confinement. But when the malady passed, they were released and free to do what they wanted with their property. And even if one of their guns had been sold, they could go get another one. It wasn't a permanent disarmament like G4 or G3. The same with the intoxication laws, just like a fray laws analyzed in Rahimi. Those had to do with temporary periods of things. And again, here, other than what the wife said in the PSR, which was not substantiated by anything, and the client adamantly disputed its sentencing, and the government put on no evidence to contradict, there was no evidence of inherent dangerousness of behavior on his part that would have justified disarming him. And the way G3 is written, it commonly analyzes very, very well. Any historical analog that could potentially apply under that really, really broad statute, which we've arguably acknowledged is mushy on its standard, would apply. You're not making a case in jail. You're making an as-applied charge. Is that right? That's correct. The other case is, I'm more making as-applied here. But there's still a category, a subcategory within that, of substance users that are not dangerously impaired and are sober. It makes sense to disarm someone temporarily when the guy's going to run out and in public carry and shoot up a bar, a house, a church. Sure, take it away until they sober up. Let them pay their fine. The client admitted that he was not sober. He admitted that he was a user of methamphetamine. He didn't say he was intoxicated. No, he admitted that he was a user of methamphetamine.  And 922G3 was no longer applying to him when he stopped using. So it's not a permanent prohibition on your client. It's a prohibition during the time when he admitted to being a user of methamphetamine. That's not completely correct, Your Honor, because under the ATF's regulation it can be over a year. And we don't know where that line falls, where a citizen would be disarmed without a court finding a ruling of dangerousness or any behavior that supports that based on just, I took some meth or I hit a bowl or I smoked a joint during the Super Bowl. Gosh, by Christmas can I have my gun again because people might rip off my packages or go after my kids. We don't know. And that's the problem with it as applied. It's a whole category of people who are still sober. And that goes back to looking at the historical analogs so much as the historical analogs. When people were sober historically, they did not disarm them. There were no justice of the peace locking people up. There were no people denied malicious service. They could have been habitual alcoholics and drunks. In fact, historically with the sugar cane production by Britain and the Virgin Islands, we had more rum in the United States than the rest of the world for half a century. We were not just loud and proud patriots. We drank a lot. And yet they weren't disarmed until it got to the point of carrying it publicly. Their conduct with a gun, their active employment of a gun, is what they temporarily and acutely address by disarmament. They never pull from them and said permanently you can never have a gun again. So the how and why of G3 on this, at least as applied to my client, is not an acceptable historical analog even under the much more deferential standard Rahimi applied. And I'm not so sure Rahimi got rid of the distinctly similar analysis even with the comment about a law in amber. The Fifth Circuit below only applied the relevantly similar analysis. They didn't even try and analyze it under the distinctly similar standard. And that gets more and more that has bothered me as defense counsel. I'm running over time, but I want to make this one point. We have all this evidence that people were not traditionally disarmed at the time of the founding. They certainly were not permanently disarmed. And yet whether it's relevantly similar or not, whether it has to match or not, that is so readily dismissed as inapplicable now. I mean, even Justice Barrett in her concurrence with Rahimi was talking about, well, the policy choices today are different. But we've got Heller saying this is a policy decision you can't change now because it happened at the time of the founding. And yet they look at the result and look at Rahimi. It grabbed surety laws and grabbed defray laws, which was actually going out and doing something in public dangerous with a gun, put together an analog sandwich and said at least for this temporary thing during this protective order, that's okay. It didn't go any further than that. G-3 does. G-3 is permanent. And I remember arguing Carter before Judge Niemeyer and Judge Hamilton and coming out and saying, well, they can control it, they can stop it. No, the law has evolved from that, and it's not only a broad prohibition in looking at a 15-year sentence. If you violate, the citizen doesn't know when it's okay. And it's not like with mental health. You can go get a psychologist to say you're okay and file something. And in the few states that follow the restoration procedure, they can get their gun rights back. The substance user can't do that. Yes. I think that's all I have. Go ahead. I know we're way over. I know. That's okay. We've asked questions. Is there a fundamental issue about whether constitutionally protected conduct applies at sentencing? We talked about that in order for supplemental briefing. And the example that was in there, I think, was the acceptance responsibility, and you made, I thought, a fair point about that's a waived situation. But it seems like from looking at circuit law that First Amendment protected conduct can be considered at sentencing. Only when it's relative to the statutory factors. Well, yeah, only when it's relevant. That's right. But too, Beckles says we can't. Excuse me? Beckles says the guidelines at sentencing are still subject to constitutional scrutiny. It rejected the void for vagueness challenge under the due process clause. It did it because prior to the Sentencing Reform Act, district judges had unfettered discretion as long as they were within the statutory range to impose a sentence. So when the guidelines constrict that discretion, void for vagueness really didn't do anything new with that, as long as you were within the statutory range. So if, but if conduct that was, that is protected by the First Amendment can be considered, I think the law is if it's relevant. The government points out that evidence that violates the Fifth and the Fourth Amendment can be considered. I wonder, and I grant you that you read Bruin, and I get the logic that Bruin, that you could say increase in someone's sentence is something that infringes or, so I get that argument. But I'm struggling with the notion of First Amendment protected conduct and other conduct that is constitutionally protected being used, and wonder whether that is appropriate to consider at sentencing, even though it might not be if that was the charge of conviction. I address the Fourth and Fifth Amendment prophylactic rules, which this Court has consistently held do not apply at sentencing, by nature of them being a prophylactic rule instead of a statutory prohibition in the amendment. That to me, I got to work with his defense attorney, but that was a conceptually significant distinction. It's a trial right, so maybe it's different. But there's First Amendment cases all over the place, and the Second Amendment, the Supreme Court ties the Second and the First together a lot. It does, but it's not uniform, and I guess you've got U.S.V. which is First Circuit from 2016. They discussed the standard and how that applies, and I would use the example, I forget which one is the 9-11 case, but it was a defendant, I guess it was a Second Circuit case, who went out and spoke about how her prosecution was trivial, it was trumped up, it was racist. She was entitled to say those things, but the Court did consider her statements in either enhancing the sentence or denying her acceptance because it didn't show contrition, and that was tied in really tight with the statutory factors you can consider, which would be the personal history and circumstances going through 3553A. This case and this issue is before we get to 3553A. It's not just compartmentalizing for the sake of it. Gaul says those have to be calculated correctly, and my position is had it been calculated correctly, not just B1 but under A, without considering the status, that would have gone in with a lower recommended range as he then considered whatever was considerable under 3553A. My hunch is my client would have gotten a shorter sentence, maybe not materially so, but easily another year off, and that's where we have the unreasonable standard of not calculating the guidelines correctly. Based on what? Based on G3 being unconstitutional. Again, it's the status that enhanced it, not just the fact of drug use, but that it fit the status under the Gun Control Act that in our position and in Alston from North Carolina, we think shows violates the Second Amendment. The historical analogs just don't support the legitimacy of that status for permanent disarmament. You don't have the same how and why. Are there analogs to discuss? Yes. But they don't meet the well-established and representative historical tradition, even as a relevantly similar tradition, that would carry the government's burden of proof under Bruin. And that's where with Step 1 it's so important for the panel, again, even if I lose, to acknowledge and rule, not assume without deciding, which was kind of the ongoing practice for 14 years, that my client is part of the people who enjoys those protections. So then we have to focus on the relative part. Bruin narrowed Step 1 from what we did with Chester to a very simple question of conduct. And everybody has just argued back and forth, no, it means more and more. We're defining the conduct as who's trying to exercise it. That's not what it says. And that's crucial here. So I'm way over, and I apologize to counsel and to the court. Thank you, Mr. Goldman. Mr. Adams. May it please the court, Troy Adams for the United States. At sentencing, the appellant requested a 36-month prison sentence, characterizing such as fair punishment. And that's exactly what he received. The district court underscored the appellant's high culpability, deserving punishment for possession of 10 NFA weapons, but noted additional enhancement factors unfairly ran the guideline range up. If base offense level and enhancement objections had been decided in the appellant's favor, his total offense level would be 19, with a criminal history category of 1, effectuating a 30- to 37-month advisory range. The 36-month downward variance requested and received falls within that range and is presumptively reasonable. Therefore, any error in sentence calculation is inconsequential and harmless. This case can alternatively be decided on other than constitutional grounds because the appellant did not challenge his NFA weapon conviction or enhancement base thereon. He, therefore, concedes the firearm-related portion of his base offense level enhancement. All that remains then to challenge is the enhancement's consideration of his unlawful drug use, which is a personal characteristic of the appellant that does not implicate Second Amendment protection. Therefore, the appellant's sentence should be affirmed. I would welcome any questions the court has. So you think that Bruin does not apply at all here? I think Bruin could apply, but under Ashwander, I believe if there is a way to resolve this case without touching on the constitutional question, that that's how the court should proceed. And I believe there are various ways in which this could be ruled on other than the constitutional question, one being the assumed harmless error inquiry, one being the fact that the court had brought up during the appellant's presentation that he does not challenge the NFA weapon conviction. Therefore, his enhancement under the base offense level doesn't raise a Second Amendment issue. It just goes to the second part, which is the personal characteristic, that being the unlawful use of controlled substances. Also, the reference to prohibited person is a reference in the enhancement under 2K2.1A4B to 922G as a whole. The appellant tries to limit that consideration to just G3, but the reference is actually describing 922G as a whole, which would include nine different categories of persons that would be prohibited from possessing firearms. And in this instance, based on Rahimi, G8 has already been found constitutional, and before this court in Canada, G1 has been constitutional, so therefore there's already two circumstances under which if a person had a Glock switch or was in that same 2K2.1A4B, there would already be instances where it has been found constitutional. But why are we, it seems like, I must just be missing this, but we're looking at whether there is an as-applied 922G3 constitutional violation. And 922G3, as a statute, hasn't been applied to Mr. Simmons, it seems to me. What's been applied under this enhancement is a portion of that who's a prohibited person. And then that has been picked up and taken out of 922G and married up with the NFA. So we don't, I mean, to be sure, we're using language from 922G, the unlawful user language, but we're not, there's not a conviction of that, there's not an enhancement for violating it. They're using that definition and applying it to the NFA possession. Yes, that's correct, Judge. And that same argument was made by the government at sentencing and actually is the basis on which the district court did rule. It found a distinction between consideration of 922G3 for purpose of conviction, which, as the court is aware, the appellant wasn't convicted of 922G, was not charged with 922G in this, or 922G3 in this case. A distinction between that conviction and just consideration of a conduct that being unlawful use of controlled substances in the context of sentencing enhancement. That's a distinction without a difference. Who cares whether it's a conviction or enhancement? The question is, you're going to be incarcerated. And his status was used to enhance his incarceration, right? And through an enhancement. That implicates a constitutional question. You say, well, no, this is not conviction. This is just an enhancement. Both of them put you in prison for a long time. So you can't just parole and say, well, no, it's not a conviction. The status made a difference here. And the status that you're saying is because he's a drug user. And it makes him more, you've got to show dangerousness, doesn't it? Isn't that the whole idea? Or is it just the status that you use drugs? Well, with respect to dangerousness and that related to unlawful drug use, this court in Carter I and Carter II, 2012 and 2014, drew a correlation between unlawful drug use and dangerousness, basing that on common sense and on empirical evidence. Noting that unlawful drug use requires an unlawful drug user to have contact with drug traffickers, which can create a dangerous situation in and of itself, but draws those individuals into black markets in order to obtain illegal substances and then also increases the likelihood of potentially violent interactions with law enforcement. So there is a correlation, not necessarily a causation, but a correlation that's already been drawn by this court between unlawful drug use and dangerousness. But here it is because it's associated with possessing guns, right? That's the status.  Right, so you can't get away from the constitutional question whether or not a person who, according to the Supreme Court, you have a right to bear, possess and bear arms in terms of a step one, right? And you should be punished whether by conviction or enhancement because you exercise that constitutional right. Why is that different because it's not a conviction? It's the same thing in enhancement. You're going to prison longer because you exercise a constitutional right. It's the government's position that the constitutional right isn't raised here because, as I pointed out, the actual firearm offense is conceded. The appellant doesn't challenge the constitutionality of the actual firearm offense for which he was brought into that sentencing guideline enhancement to start with, that being the possession of the NFA firearm. But the possession alone is not enough. It's the status of being the drug user that makes the enhancement work. Is that right? Well, that is a characteristic of the defendant. A characteristic that has to work in conjunction with possession of a firearm. So the firearm is considered within separate. There was not unlawful use. And the appellant was being sentenced within the guidelines for possession of a NFA firearm that has not been registered. He would be at a base offense level 18. What brings him to the base offense level 20 that the district court calculated was the additional characteristic of unlawful drug use. I know what you call a characteristic. I say it's a status, for example, at this point right here. That's what they argue. It's a status. Even if you call it a characteristic, it requires both the possession and the characteristic. Do you agree with that? Yes. And if that characteristic implicates a status in terms of prohibiting possession of a weapon, then that does. You can't get around Bruin by saying, well, it's not a conviction. But it is. It's the same thing. I mean, that's the essence of governmental control is to put you in prison and put you there longer, longer, because you have a characteristic that happens to be covered under the Second Amendment, perhaps. And that's what, you know, Hellers, it changed. It was seismic. Bruin, seismic. And then it says that unless you're saying, we the people, unless you're saying he doesn't fall in, we the people, and the Supreme Court is not going that far, don't you have to then get to the second step to find a historical analog just because someone is using drugs? A lot of people use drugs, and they function and do all kinds of things. And so, I mean, they're dangerous because they're using drugs? They could be, but just because of that, and therefore they can't have a weapon? I believe there is a correlation between unlawful drug use and dangerousness, as I pointed out in the book. Really? Really. Just because you use it. By the way, so you're saying that if a person smokes marijuana and then they're dangerous to whom? Dangerous to themselves and to others. They smoke a joint and they're dangerous to themselves? So in order to – No, no, I'm just – it says user. You smoke a joint, you're dangerous to yourself? Mind you, this is a place where many states, this is not even illegal. In Virginia, my home state, simple possession, that kind of – so that, you said, is automatically dangerous? So certain drugs would certainly have different effects on different individuals, and in order to even be brought into that unlawful user category, it would require more than just – So 923 says it has to be what? It can't be marijuana, right? Not that it can't be marijuana. No, it doesn't say that at all. That's why I use marijuana. So marijuana, you smoke a joint, then you are dangerous, per se. The way that an individual is brought into unlawful user category would be that that use has to be consistent and prolonged and simultaneous with the gun possession. So I'm not sure – Was he intoxicated when he was arrested? At sentencing, the government – You answer my question or you're just going to go on? I said, was he intoxicated when he was arrested? The pretrial services report that was drafted at the time of his arrest, at the time he was found in possession of the 43 firearms, including the 10 NFA weapons, showed that he tested positive on that date for methamphetamine and marijuana. That he had used it? That he had – that would be an indication that he had used. That's correct. So use and intoxication is the same thing, just he used it. So you're saying the fact that he used it makes him intoxicated. Like, for example, like driving under the influence, drinking one drink doesn't make it illegal to drive, does it? It doesn't have to be a level, of course. It does. Right, of impairment. But you're saying using a drug makes you dangerous, period. Correct. There can be a distinction between unlawful use and intoxication. But the government's argument is that it's not necessarily the intoxication alone that makes an unlawful user dangerous. It's the lifestyle that comes along with unlawful use. And that, as I pointed out, the various characteristics of an unlawful user, pointed out in Carter, the interaction with drug traffickers, the interaction in black markets to obtain their controlled substances, and then, again, the heightened chance of violent, confrontational interaction with law enforcement. So it's not just the intoxication alone. But as applied to him, you don't have those facts here, that he was a drug trafficker, do you? No, Your Honor. No, you don't. That's why it's an as-applied challenge. Well, and the correlation to dangerousness isn't just limited to a drug trafficker. That would apply to a drug user. That's what was... That's what I'm saying. It goes back to just using drugs is enough, as you said, to make you dangerous. And that's enough to get you a higher sentence for exercising a constitutional right to bear arms. That's important, isn't it? I mean, you certainly couldn't have something that gave you a higher sentence because you practiced a certain religion in the First Amendment, could you? I'm sorry, I don't know if I'm... You couldn't have an enhancement that gave you more time, not a conviction, but an enhancement because it was based on the religion you practiced. Well, we would have... You couldn't, could you? No. And that's the First Amendment, isn't it? Correct. Okay. But the Second Amendment would be different? The Second Amendment would be different? I'm following the Supreme Court now, and that's not me. That's why they said... Heller says it is a quintessential element of a handgun to have it for your protection. And then Bruin says, no, it's beyond just a home. That's what it said. And more importantly, you can't even use means and ends in terms of limiting it. You've got to find a historical analog. It was meant... To me, step one was not meant to be a heavy lift, unless you start getting into things like women couldn't vote or African Americans were enslaved and they're not the people, unless you want to go there and nobody's gone there. So other than that, if you're a person, you're entitled to have Second Amendment rights, don't you? Unless you said the weapon is something that's out of the mainstream, then you go to step two and the burden is on you. Do you agree that the burden is on you? Yes, Your Honor. With respect to the Bruin analysis, it's still the government's position that as an unlawful user of controlled substances, the appellant is not a law-abiding citizen and therefore is not part of the people. But even if the court doesn't... So you're going beyond Rahimi and everything, right? You're going beyond Rahimi. Rahimi addressed the term. It's endangered territory that the Supreme Court didn't go into. But go ahead. Go ahead. I'll make an argument. Just pointing out, the Rahimi court described reasonable as vague but didn't touch on law-abiding. But even if the court would not rule based on the step one, the textual part of the Bruin analysis, it's the government's argument that there are sufficient historical analogs to support this step two. Before you get there, counsel, I want to talk about B-1. B-1 seems to increase the offense level by various points based on the number of firearms involved in the offense. And the offense, as I understand it here, is possession of NFA firearms without being registered. Is that correct? The offense of conviction would be the possession of the NFA weapon. It is the government's understanding of the enhancement under B-1 that that would include all firearms that are unlawfully possessed by the appellant. The commentary note to B-1 states it includes all weapons that are unlawfully possessed, which, as an unlawful user, he would not be able to possess the NFA weapons or the other 33 weapons that were seized from his home. It just seems to me that it says the offense. I mean, it's singular. And the only offense in this case is an NFA weapon. It seems to me, I guess that's your argument, that we talk about offense that he hasn't even been charged with for this enhancement. I'm having trouble making that. If you look at most of the cases that are applying B-1, they are dealing with 922G3-type weapons. But this is different. This is different than, I think, any case out there. And here our possession is an NFA weapon, which probably under Bianchi isn't protected by the Second Amendment. I just don't see how you can read offense to be something other than the offense he's charged with. Your Honor, it's the government's understanding that B-1 would take into account all relevant conduct, which would include all firearms that he had in his possession at that time. That's a separate argument. Relevant conduct is one thing. I mean, the sentencing talks about relevant conduct. And if you wanted to say relevant conduct there, then I think that frames maybe more what your colleague is arguing. But I don't see how B-1, applying it according to its text, can apply the offense to anything other than the NFA offense. That's the only offense in this case. The government understands the court's interpretation. We just disagree. Just disagree. And referring to the commentary that tries to describe that further and pointing out that it includes all firearms that were unlawfully possessed. Does the government feel like that issue is something that's before the court and properly preserved and something we can – who knows whether we'll be convinced by it. But is that a preserved issue for us to consider? The B-1 issue? Yeah. The issue I'm pressing you on on whether it includes possession of weapons or guns that are not the NFA offense. I don't recall that argument being raised by the appellant. But it's a necessary predicate to see whether we have a constitutional issue, isn't it? It would be. And if hypothetically I'm right, it would make sense not to decide a constitutional issue if there's an error in calculation that doesn't get us there. Ashwander would direct that, yes. I apologize. I'm out of time. If there are no further questions, I would just ask the court to affirm the district court's sentence. Thank you, counsel. Mr. Coleman, you have some time reserved. Quickly, in light of your intelligence earlier, the questions about dangerousness and drugs. Colorado and Washington were the first states to legalize marijuana in 2012. In FY 2024, we have 24 states that have legalized it recreationally. This isn't a case about marijuana. Can you get away from the marijuana conversation and move on to the question of the methamphetamine use? There were both, your honor. That was my point. I'm not denying that. It wasn't marijuana? Yeah, I thought so, too. Yes, sir. You had 14 approved for medical use. Seven sell CBD oil only. We're down to four jurisdictions now. Idaho, Wyoming, Nebraska, and South Dakota. Didn't the district court speak about the methamphetamine use? Yes, ma'am. I believe he focused on both. That was a statement, and that's what they found with a warrant. And it was a nominal use. The drug use generally, yes, ma'am, as noted in the PSR. I'm not disputing any of that, sir. I know you're being respectful, but it's yes, your honor. I'm sorry? You said ma'am. Oh, yes, your honor. Yes. Thank you. Go ahead. If you... The Sentencing Commission has a quick facts resource, some I've cited to in sentencing memos. Even after Rehafe and Justice Alito's prediction that adding a scienter requirement would make it impossible to prosecute 922G1 cases, there were 7,600 the same year in 2019 when Rehafe was decided. By 2024, we were back up to 8,040. 165 of these defendants were NFA sentenced. There were 2,400 as prohibited persons under, at a base offense level 14. The rest of those were primarily made up of almost 88% G1 cases, at least last year. Mr. Adams answered your question about dangerousness going back to Carter. I argued both the Carter cases and Judge Neuminer's resort to empirical evidence, drug use, who they hung out with, access to black markets. That was all part of means in scrutiny and seeing whether there was governmental interest to justify the prohibition. There are no historical analogs based on any of this. In fact, the founders did not strip regular users of intoxicants of their fundamental rights, regardless. So, Judge Quantenbaum, your honor, I need to address the dangerousness with your question, and I guess I was perplexed earlier. It does say offense in 2K2B1, but I always have to go back to 1B1I defining offense. And that has the offense of conviction plus relevant conduct defining the use of offense in the guidelines. So, to answer your question, and I should have done this earlier, I had looked during the break. I don't think you can avoid the constitutional issue just by looking at that with B1 with the offense. I don't believe that with the constitutional issue, the non-NFA guns were relevant conduct. That's part of the objection to the G3. Otherwise, if they were, then I really don't have an issue with calculation and that two-level enhancement between the four and the six for the number of guns. So, I think we do have to focus on the constitutional issue and decide that. And I agree with Judge Gregory bringing over just the definition doesn't insulate it from lack of a constitutional challenge. You don't need a conviction for that. Just like you don't need a conviction to be guilty of G3. Yeah, I understand the point on B1. I guess my point is certainly the use of status raises questions. But the use of status combined with a weapon that's not protected, I'm not sure creates Second Amendment problems. It's much less there than it would be with weapons he could possess if he didn't have the status. That's my argument, at least. I get your argument that if it's in B1, if non-FAA, I think your point is that if non-FAA weapons are used in B1, we have that situation there. I may disagree based on the application, but I understand your argument. Thank you, Mr. Coleman. Any further questions? All right. I want to thank both counsel. I'm going to ask the clerk to adjourn the court, sign a die, and it will come down to Greek counsel. This honorable court stands adjourned, sign a die. God save the United States and this honorable court.
judges: Roger L. Gregory, A. Marvin Quattlebaum Jr., Nicole G. Berner